MARBLE & SHATTUCK CHAIR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14091, 14092, 32033. Promulgated September 28, 1928.

*Ben Jenkins*, Esq., for the petitioner.
*L. L. Hight*, Esq., and *J. M. Morawski*, Esq., for the respondent.

OPINION.

SMITH: The principal question presented by these proceedings is whether the petitioner is entitled to deduct from gross income in its income-tax returns for the fiscal years ended June 30, 1920, and June 30, 1921, $40,000 distributed at the close of each of those years to its stockholders. The distribution was equal to $5.33⅓ cents per share of common stock; F. D. Hills, A. B. Hunn, and H. G. Hunn, owning 3,544 shares of stock, received their pro rata shares of the distribution, but T. W. Foote, owning 3,942 shares, received slightly more than his pro rata share—he receiving the pro rata share which would have been paid to Hanson, owning 18 shares, if the distribution had been strictly in accordance with the stockholdings. The petitioner claims the deduction of $40,000 distributed at the close of each of the taxable years referred to as compensation paid for personal services actually rendered under section 234(a)(1) of the Revenue Acts of 1918 and 1921, which provides that a corporation may deduct from gross income in its income-tax returns all ordinary and necessary expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The Commissioner has disallowed the deductions upon the ground that the amounts were in effect distributions of profits to the stockholders.

The evidence of record with respect to this distribution shows that T. W. Foote testified as follows:

Q. Did you reach any determination as to approximately the salaries that should be paid?

A. Mr. Hills, who was president, stated that he was under some expense in taking our trade out when they visited our factory, as he was drawing nothing in the way of compensation as president, and felt entitled to a reasonable return. Mr. A. B. Hunn spoke about the increase in his traveling expenses and maintenance of his office in New York, and spoke of other firms in the same industry paying more in the shape of commission, when the salesmen had to pay their own expenses and maintenance of their office. I, on the other hand pointed out to them that I had sold over $200,000 worth of goods, and if I were paid the prevailing commission of seven per cent, that my sales alone would have netted over $14,000. Mr. H. G. Hunn was in agreement with Mr. A. B. Hunn relative to the commission that should be paid, and showed where other houses that were making a high grade line, such as we professed to make, were paying their salesmen ten per cent. So after discussing all these points, we tried to set approximately what each one would get operating on some where near a correct basis of compensation. The thing was left for me to formulate after we had arrived at the approximate amount, or benefits, each one would receive. In round figures, to my best recollection, Mr. Hills was allowed $2,500 a year; and, based on my sales, which was added remuneration to me in excess of the salary I was allowed, I was to be given about $20,000 a year, which would be based on our sales, and not on our—you can call it a commission or salary bonus, or however you describe it—dependent upon what I sold. And, as I recollect, the rate of sales being made by Mr. A. B. Hunn were in the neighborhood of $340,000 or $350,000 a year, which would entitle him to in

the neighborhood of $34,000 or $35,000 in the shape of commissions. Mr. H. G. Hunn's sales were considerably less than Mr. Arthur Hunn or myself; I don't remember just what his sales figured but that is a matter of record. * * *

On cross examination he testified as follows:

Q. Whatever money that you got out of the Marble & Shattuck Company came in the way of dividends declared by the Company at the close of their fiscal year or whatever time they made dividend declarations?

A. Yes, sir.

Q. It is true, is it not, if there had been a declaration of dividends whereby your company would have distributed $40,000 in dividends, you would have received dividends to the same amount, of that $40,000, that you received in the way of additional compensation? That is true, isn't it?

A. I would have received slightly more on a strictly commission basis than I received through the salary bonus.

Q. You would have received slightly more?

A. If I had been paid on a commission basis and had been paid for the work I did.

Q. In the year 1920, it was not by any vote of the directors that you should receive a commission in addition to salaries?

A That was the point I raised, in discussing what I felt I was entitled to.

Q. Was there any discussion toward the close of the year how you were going to split up this very big profit that you had, before it was decided that you could pay more pay to the people who had been doing your work?

A. Based upon what they were accomplishing.

Q. Based upon what you found they had done in the way of sales?

A. Yes.

Q. Your Company declared dividends on other amounts this year, did they?

A. Which year?

Q. In 1920. You received dividends as well as additional salary?

A. No dividends.

Q. You used the money you would have used in paying dividends in paying salaries, didn't you?

A. That is the way that we used it.

Q. That which you distributed, if you had not taken up this proposition of adding to your compensation, you would have received in dividends if a dividend declaration had been made?

A. Yes, sir.

Q. As a matter of fact, I believe that you reported this as a dividend?

A. No; I reported it as a salary bonus.

Q. Some of your men reported it as a dividend.

A. I reported it as salary.

Q. So far as you are concerned, you reported it as salary?

A. Yes.

This evidence indicates that at the close of the fiscal year ended June 30, 1920, the petitioner knew that its profits for the fiscal year would be unusually large. The stockholders considered that the compensation which was being paid to them was less than they were entitled to receive for personal services actually rendered to the corporation. It was believed that fair commissions were 10 per cent of the gross sales. The stockholders agreed among themselves

that in lieu of paying a dividend of approximately $40,000, the same should be distributed to them as additional compensation. This amount in addition to the amounts theretofore received would make the commissions on sales of the principal stockholders for the fiscal year ended in 1920 approximately 10 per cent. It appears to have been the expectation of the stockholders that $37,500 would thus be distributed. But the determination of the distribution was left to Foote, who was the principal stockholder, the treasurer, and the general manager. He determined that the distribution should be made according to stockholdings, except that Hanson, who owned only 18 shares, was to receive no part thereof. Foote being the principal stockholder, received the pro rata share that would have gone to Hanson if the amount were paid as a dividend on stockholdings.

Although a payment of additional amounts to employees of a corporation as compensation for personal services actually rendered is not to be disallowed as a deduction from gross income simply because paid in direct proportion to the stockholdings of such employees, it must be made plain that the amounts distributed are paid as compensation for personal services rendered and not merely as a distribution of profits. In *Woodcliff Silk Mills*, 1 B. T. A. 715, we said:

\* \* \* The fact that salaries paid to its officers by a corporation are in direct proportion to the stockholdings of the respective officers is strong evidence of an intent to distribute profits as salaries and must be overcome by clear evidence showing that the salaries are reasonable in amount and actually represent compensation for personal services rendered. \* \* \*

The amount of compensation which a corporation shall pay its officers for their personal service is, in the first instance, a matter within the judgment and discretion of its board of directors, and the only limitation upon the deduction of such amount for income tax purposes is that the amount must be reasonable. \* \* \*

We can not determine from the evidence before us what would constitute reasonable compensation of the stockholders for services actually rendered during the fiscal years ended June 30, 1920, and June 30, 1921. Foote was paid a salary of $12,000, which was double the amount that he had received prior to some time in 1919 or early 1920. He claims that in addition to that amount paid him for managing the business he should receive 10 per cent upon sales made at the factory for which presumably he was responsible. This, however, is not clearly proven. The evidence does not show that Foote maintained any separate office for the making of sales or that he incurred any expenses in connection with the making of such sales. Neither does it appear that he was responsible for any sales made during the fiscal year 1921. It also appears that A. B. Hunn and

H. G. Hunn received during the fiscal year ended June 30, 1920, in addition to compensation of 7 per cent upon sales, 25 cents for each chair sold. The amount of this additional compensation is not before us. Fred D. Hills, the president, received no salary up to the beginning of the fiscal year ended June 30, 1920. He was under some expense for entertaining customers who came to the office. The $2,560 paid to him during each of the years 1920 and 1921 was for the purpose of reimbursing him for expenses made. We think that this amount is clearly an ordinary and necessary expense of the petitioner. It is immaterial that it was paid directly in proportion to his shareholdings. We believe, however, that the evidence warrants the determination that the balance of the $40,000 paid during each of the years 1920 and 1921 was a distribution of profits as determined by the Commissioner. The disallowance of the deduction of $37,440 of the $40,000 distributed during each of these years is therefore sustained.

It has been set forth in the findings of fact and agreed to by the parties that the expenditures for kiln equipment made in 1920 and 1921, and included in the building account, should properly be transferred to the machinery and equipment account.

The petitioner alleges that it is entitled to a depreciation rate of 10 per cent on machinery and equipment, whereas the Commissioner has allowed depreciation at the rate of only 7½ per cent per annum. In support of its contention petitioner introduced the testimony of T. W. Foote, the superintendent and manager of the company, who stated that in his opinion machinery and equipment had a life of only 10 years. However, it appears from his testimony that he left out from his consideration the normal replacement of parts of operating mechanism and pipe due to use, accidents, and rusting since he stated, "I am not saying that the main structure of the machines won't be as good as the day it was manufactured. I am speaking of the operating mechanism." It has not been shown that the replacement of rusted pipes and operating mechanism has been charged to capital. After a review of the testimony on this point we are of the opinion that the petitioner has failed to show that the depreciation allowed by the Commissioner was inadequate except that an adjustment should be made on account of a transfer of $23,398.89 from the building account to the machinery and equipment account which would institute a recomputation of depreciation.

Petitioner claims that the $5,333.06 spent by it during the fiscal year ended June 30, 1920, in the remodeling of a building, was for repairs. The respondent contends, on the other hand, that it was for an improvement or betterment to the building and that the amount does not constitute an ordinary and necessary expense of operation.

The evidence indicates that the repairs made upon the roof constituting $1,201.75 was a repair expense. The roof was damaged by workmen walking across it in putting the flue pipe through the roof and it was necessary to replace about one-fourth of the roof. We are of the opinion, however, that the cost of bricking up the windows in a wall for the purpose of strengthening the wall was in no proper sense a repair of the wall. The evidence indicates that the wall was close to the main line of the New York Central Railroad tracks and that the vibration of the trains passing caused cracks to come in the wall and it was the engineer's opinion that the wall should be strengthened by bricking up the windows. We are also of the opinion that the cost of putting in the ventilating pipe was a betterment or improvement and that the respondent has correctly classified the payment as a capital payment. Of the $5,333.06 disallowed as a deduction, we think that only $1,201.75 paid for the replacement of a portion of the roof can properly be claimed as such.

*Judgment will be entered under Rule 50.*