BUFFALO UNION FURNACE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16075, 16076. Promulgated May 28, 1931.

440

*Ralph Ulsh, Esq.*, for the petitioner.
*John D. Foley, Esq.*, and *James C. Maddox, Esq.*, for the respondent.

## OPINION.

SEAWELL: 1. The first question at issue in this case is the contention of the petitioner that it is entitled to a deduction of 10 per cent on its plant assets on account of depreciation and obsolescence, whereas the Commissioner has allowed only 5 per cent. The principal point in dispute and that to which the greater part of the evidence was directed is as to obsolescence which occurred as a result of the new type of blast furnace construction which began to be installed about 1918. There appeared to be little, if any, dispute between the parties that, leaving out of consideration the factor of obsolescence and the exhaustion of furnace linings, the composite rate of 5 per cent taken as depreciation by the petitioner for the years preceding those before us, which is the same as that allowed by the Commissioner in determining the deficiencies for the years on appeal, is fair and reasonable. That is, the Commissioner does not contend that the rate of 5 per cent is sufficient to take care of depreciation and also obsolescence, but rather that there were not substantial reasons for believing in the years before us that the assets in question would become obsolete prior to the end of their useful life. Further, it should be observed that, because of the integral character of the blast furnace units, the obsolescence with which we are concerned relates to the entire plant, with a few minor exceptions not deemed material by either party.

The statute provides (section 234 (a) (7) of the Revenue Act of 1918) for a " reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." That is, a reasonable deduction is allowable on account of the exhaustion, wear and tear of property used in a trade or business, including obsolescence, if the property is becoming obsolete, so that by the time the property reaches the end of its useful life the entire cost thereof will be restored. Like depreciation, whether property is becoming obsolete is a question of fact in each case, and when it is found that such a condition is taking place a deduction on that account can be determined by ascertaining when the property may no longer be expected, under the circumstances, to be commercially useful notwithstanding its physical condition. *Columbia Malting Co.*, 1 B. T. A. 999. See also the recent case of *Burnet* v. *Niagara Falls Brewing Co.*, 282 U. S. 648, wherein the court said:

It would be unreasonable and violate that canon of construction to put upon the taxpayer the burden of proving to a reasonable certainty the existence and

amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required. In determining the proper deduction for obsolescence there is to be taken into consideration the amount probably recoverable, at the end of its service, by putting the property to another use or by selling it as scrap or otherwise. There is no hard and fast rule, as suggested by the Government, that a taxpayer must show that his property will be scrapped or cease to be used or useful for any purpose, before any allowance may be made for obsolescence.

We are satisfied from the evidence here presented that it was known to the petitioner in the fiscal year ended April 30, 1919, that the changes which were taking place in blast furnace construction would render its blast furnaces obsolete prior to the end of their useful life. At that time the heavier and larger type of furnace was replacing the smaller type of furnace and thereafter became the standard type of construction. These newer furnaces embodied many radical improvements in equipment and operation which resulted in a substantial reduction in the cost of manufacturing pig iron. Another result of this development was to bring steel mills into competition with merchant blast furnaces such as operated by the petitioner, because of the surplus product produced. The changes which were taking place were known to petitioner's officers and were discussed by them. At that time the petitioner fixed a rate of 10 per cent, and a witness who was then vice president of the petitioner testified that this was done because it was then known that the plant would become obsolete prior to the end of its useful life. The furnaces were abandoned approximately within the time provided for by the rate of 10 per cent. While to say that the latter fact establishes the rate allowable might be said to allow "hindsight" to take the place of "foresight," it is a fact which can not be overlooked in substantiation of evidence offered as to the situation known to exist during the years with which we are concerned.

Since we are satisfied that the petitioner's furnaces were becoming obsolete in the years before us and that this fact was known to petitioner, our question is as to how long it was reasonably expected by petitioner that it could operate its plant profitably without installing the more modern type of furnace. Petitioner's vice president testified that the petitioner's officers were of the opinion that they could not operate more than seven or eight years without replacing their furnaces and on this basis fixed a rate of 10 per cent. The testimony of Mr. Brassert, an expert in the construction of blast furnaces and familiar with petitioner's furnaces and plant,

was to the effect that a period of seven to ten years of operations was what could reasonably have been anticipated in 1919. One of petitioner's furnaces was abandoned in 1925, another in 1928, and the third was expected to be operated for only a short time after the hearing in this proceeding. On the other hand, we find that the repairs were very heavy for the years before us and that the petitioner's plant was kept in an excellent state of repair. And, too, much importance is attached by the Commissioner to the fact that on July 1, 1920, the petitioner leased its entire plant to the Hanna Furnace Company for a period of 40 years with option on the part of the lessee to purchase at the end of 20 years. The lease provided that the lessee would maintain the plant in such condition that upon its return to the petitioner at the expiration of its term it would constitute a modern pig-iron producing plant. There were, however, important considerations entering into the negotiations for the lease other than that of securing the plant for operating purposes—particularly, relief on the part of the lessee from an extremely burdensome ore contract, and the transaction in many respects was more like a sale than a lease. And even if looked at as a lease in the ordinary sense, we do not think a taxpayer can be denied obsolescence which is occurring merely because an advantageous contract is made after it has been ascertained that a given asset will become obsolete at a future date. Further, the large losses of some $4,000,000 sustained by the lessee during its period of operations, even with large expenditures for repairs, tend to confirm the fact that obsolescence was taking place as contended by the petitioner. Another factor to be considered is the petitioner's good will and valuable trade connections which were of such a nature that both the petitioner and the lessee considered them important elements in allaying to a certain extent obsolescence which would arise in connection with competition from the more modern furnace.

But before finally disposing of the foregoing issue we will discuss the claim of the petitioner that, in addition to the deduction on account of depreciation and obsolescence, it is also entitled to a further deduction on account of additions to a reserve for relining furnaces, whereas the Commissioner has disallowed all additions to this reserve. An examination of the evidence submitted with respect to this contention shows that this is not a reserve set up on the basis of the exhaustion of the furnace linings, but rather on the basis of what it would cost to replace them upon their exhaustion. In periods of constant prices or costs it would be immaterial which basis is said to be used as the same results would be reached in each instance, but where prices or costs are rising or falling the results are not the same. While the statute provides for deductions on account of the exhaustion, wear and tear of physical assets

to the end that the cost thereof may be restored upon the expiration of their useful life, we find no provision under which a taxpayer may set up a fund which would necessarily replace a given asset upon its ultimate exhaustion. For example, if a taxpayer has a building which cost $100,000, but at the end of its useful life cost $150,000 to replace, additions to a reserve would be allowable on the basis of the $100,000 cost, but not on the basis that $150,000 would be required to replace the original $100,000 of cost. The argument of the petitioner is that it should be allowed the additions to the reserve as ordinary and necessary expenses of carrying on its business on the ground that they are generally recognized in the industry and that without the recognition of these items costs of producing its product are understated. What items are capital and what are ordinary and necessary expenses is governed by the statute and we are of the opinion that this can not be varied because of a practice in a given industry. The contention as to the understatement of costs for the purpose of determining net income for tax purposes would be sound only to the extent that provision is not made for adequate deductions on account of the exhaustion of physical assets to the end that their cost may be restored at the expiration of their useful life. It is, of course, not correct to say that no provision is made for the exhaustion of furnace linings in the deductions as allowed by the Commissioner, for the reason that the original cost of furnace linings is included in the plant account on which a composite rate of 5 per cent has been allowed. Of itself, however, it would not be sufficient as shown by the evidence as to the average life of the linings of from 2 to 2½ years, and from the further fact that the petitioner expended approximately $261,000 for furnace relinings over the period 1917 to 1920. During that period one furnace was relined once from the mantle up at a cost of $34,787.05 and completely relined two years later at a cost of $117,377.45. The total allowance by the Commissioner for all depreciation for the entire plant of approximately $140,000 per year over this period was but little more than double the furnace relining costs. It further appears that additions to the reserve were allowed by the Commissioner in prior years in addition to the composite rate of 5 per cent on the entire plant account.

When we consider the whole record on the two issues as discussed above, both of which are questions of fact, we are satisfied that the rate of 5 per cent allowed by the Commissioner on the petitioner's entire plant account was insufficient to take care of both depreciation and obsolescence and that while additions to the reserve for relining furnaces can not be allowed, consideration should be given to the life of these linings in fixing a depreciation rate for the entire plant. In

short, we are of the opinion that a fair and reasonable allowance for both depreciation and obsolescence (including depreciation on the furnace linings) is obtainable on the basis of 10 per cent of the plant account without the allowance of additions to the reserve for furnace linings, and we so find.

2. The next issue is the deduction to which petitioner is entitled on account of the collapse of a portion of its dock and the expenditures incident to its restoration. In substance, what occurred was that a section of petitioner's dock collapsed and slid into the river, taking with it a quantity of ore which was stored on the dock. Before the dock was restored to its former state of usefulness it was necessary to remove the wrecked portion of the dock and earth which had slid into the channel and also to recover the ore which had subsided into the river. The cost of this so-called preliminary work was $121,537.03 and this has been allowed as an expense deduction by the Commissioner. In addition, the petitioner expended $202,690 in the restoration of the dock which included not only the dock proper, but also the storage area back of the dock. The petitioner capitalized $25,000 of this amount and claimed the remainder as a deductible expense on the ground that this remainder represented incidental repairs which neither materially added to the value of the property nor appreciably prolonged its life, but were necessary merely to restore the property to its former operating condition. On the other hand, the Commissioner considered the entire amount of $202,690 as a capital item and therefore not deductible, though at the hearing he conceded that the petitioner was entitled to a loss of $40,005 as the cost of the portion of the dock which was destroyed.

The evidence is to the effect that of the $202,690 in question $83,890 was expended in restoring the dock and $118,800 the back area, and the two items will be disposed of separately. With respect to the dock restoration, we are unable to agree with petitioner that this amount represents what might ordinarily be termed a repair item. What is a repair item and therefore deductible in the year when expended and what is a replacement item and therefore to be capitalized is often difficult of ascertainment and definitions or plausible reasoning may be presented to suit the particular position sought to be upheld and no general rule can be laid down which would be applicable to all cases. As we said in *Joseph E. Hubinger*, 13 B. T. A. 960:

Counsel for petitioner cites many cases in which the word "repair" is defined and distinguished from such terms as replacements, betterments, improvements, and so on. The difficulties that lie in the way of adopting any general rule and attempting to fit all cases to it are obvious. An item, in relation to income, may in one case be so insignificant that it would be absurd to require its capitalization even though under a technical definition it might be an improve-

ment, while in another case the cost of a similar item might be sufficient to absorb all the income for the year. We can not believe that Congress intended to allow as charges against the revenues of a day or year the cost of restoring major parts of income-producing property where the restoration is of such character as to be useful over a long period of years.

And, further, we have this statement from *Hubinger* v. *Commissioner*, 36 Fed. (2d) 724 (affirming the foregoing Board decision), with respect to ordinary expenses in the case of a fire or casualty:

In other words, where a loss sufficient to be regarded as within the purview of (a) (4) or (a) (6) occurs, it is the occasion rather than the precise kind of reconditioning done that determines whether the particular outlay involves "ordinary and necessary expenses" or "losses." Any other view requires a determination in case of each serious fire which comes short of total destruction of just the extent of damage from that casualty which involves a capital expenditure to restore it and which involves a mere ordinary repair. We think the statute contemplates no such difficult classification, but places damage due to *casualty* in the sense we have used that term in the category of "losses." Moreover, a replacement of damage from a devastating fire while perhaps a "necessary" expense cannot be regarded as an "ordinary" one. "Ordinary * * * expenses" in the most natural meaning of the words are those due to wear and tear and trifling accidental causes.

We are of the opinion that the expenditures here made in the restoration of the dock proper come squarely within the principles laid down above and constitute replacements rather than repairs. Even conceding, as the petitioner contends, that the restored dock had no more utility value to the petitioner than that which had been destroyed and even assuming that the reconstruction could have been done in the same manner in every respect as the original construction, we do not understand that this would make the reconstruction cost deductible. What occurred was that the petitioner lost a capital asset and now has another in its place. The cost of the asset lost is a proper deduction, which we understand is being allowed in the conceded amount of $40,005, and the cost of the new asset should be capitalized in the amount of $83,890. Cf. *Ben Baer*, 12 B. T. A. 1060; *Joseph E. Hubinger*, *supra;* and *Hubinger* v. *Commissioner*, *supra*. The cases of *Illinois Merchants Trust Co., Executor*, 4 B. T. A. 103, and *J. W. Forgeus*, 6 B. T. A. 291, on which much reliance is placed by the petitioner, are distinguishable from the case at bar, in so far as deductions there allowed are concerned, on the ground of the difference in character of expenditures and the circumstances under which made.

And much that is said above applies with equal force to the item of $118,800, though a slightly different situation exists because of the character of that which was destroyed. The back area, which consisted of natural original clay earth, was in effect as much a part of the dock as the portion constructed of wood, steel, stone, etc.,

though as to the former we have no construction costs, whereas this is not true as to the latter. It may be merely a fortunate circumstance that this land could be availed of for dock purposes without cost other than for the land itself, and it may be equally unfortunate that the petitioner lost through a casualty that which was necessary to be replaced through new capital construction, but we find no provision in the statute which would allow a deduction on account of damage to property other than on the basis of the cost or March 1, 1913, value of the property damaged. Whatever cost or March 1, 1913, value was applicable to the back area was perhaps small as compared with the reconstruction cost, but in any event no showing was made in this respect. Further, we are unable to agree with petitioner that the restoration of this back area was merely an incidental repair. In effect what it did, in the restoration work, was to build a new back area in the same sense that it would have been required to do had this been low ground when the original dock was built. Piles were sunk, a concrete mat was placed over the entire area, and the concrete crib under the back fill was reinforced at a cost in the respective amounts of $48,600, $43,640, and $24,160. In our opinion, these expenditures can not be viewed other than of a capital nature. The amount of $2,200 expended for the new sewer is of course a replacement and therefore should be capitalized.

3. The next issue presented relates to the treatment to be given the receipt by the petitioner in the fiscal year ended April 30, 1921, of $70,863.88, on account of a settlement with certain railroads. In short, what occurred was that from about 1904 or 1905 petitioner was seeking relief on account of certain alleged discriminatory practices on the part of the railroads, wherein the railroads were either performing or causing to be performed switching services for petitioner's competitors without charge or were making an allowance to them when they performed the service themselves, whereas similar treatment was not accorded petitioner. In 1911, on the basis of a complaint filed by the petitioner, the Interstate Commerce Commission found that the discriminatory practice existed, but left open the question of reparation to be awarded. Subsequent hearings were held before the Commission and finally in 1917 the Commission entered an order requiring the railroads to pay the petitioner the cost of rendering the service from 1905 to 1914, namely, $139,736.98. The railroads, however, refused to pay and the petitioner instituted suits to enforce collection, but before the suits came to trial they were compromised in 1920 through the payment by the railroads to the petitioner of $70,863.88. The contention of the Commissioner is that the entire amount is taxable income in the year when received as compensation for service performed in prior years, which compensation was not finally fixed and determined as a definite liability

460

until the year when received, whereas the petitioner contends that the amount received was not taxable income, but rather a partial reimbursement for the cost of expenditures made by the petitioner for the account of the railroads.

In the first place, we are unable to agree with petitioner that the expenditures for which it was reimbursed were other than its own expenses. It is, of course, true that the railroads were finally required to pay an amount as an award of damages for a discriminatory wrong which was measured by the expenditure made, but this does not necessarily make the expenditure that of the railroads. It was the petitioner who incurred and paid the expense of spotting its cars for the purpose of carying on its business, and the amount so expended was treated by it as an ordinary business expense. That because of the discrimination then being practiced by the railroads a cause of action arose in favor of the petitioner through which the amount here in question was recovered does not, in our opinion, mean that the petitioner was reimbursed for an expense which it had made on behalf of the railroads, but rather that the railroads committed a wrong through discriminatory practice and that the award of damage on account of such wrong was measured by the expenditure which the petitioner had made.

And when we come to consider the taxability of the amount recovered and, if taxable, when it should be taxed, we find it difficult to distinguish the situation presented from that considered in *Burnet, Commissioner* v. *Sanford & Brooks Co.*, 282 U. S. 359; in fact, the petitioner relies on that case as decided by the Circuit Court of Appeals (*Sanford & Brooks Co.* v. *Commissioner*, 35 Fed. (2d) 312) as authority for the proposition that the amount recovered is not taxable income, though, at the time briefs were filed, the decision of the Supreme Court which reversed the Circuit Court of Appeals had not been rendered. As shown in the aforementioned case, Sanford & Brooks Company was engaged from 1913 to 1915 in carrying out a Government contract for dredging the Delaware River. During those years it included in gross income for each year the payments made to it under the contract and deducted the expenses paid in performing the contract. In 1915 work under the contract was abandoned and in 1916 suit was brought to recover for a breach of warranty of the character of the material to be dredged. Recovery was finally had in 1920 upon the contract and was " compensatory of the cost of the work of which the Government got the benefit." The court, in deciding that the entire amount received in 1920 should be taxed as income for that year, said:

That the recovery made by respondent in 1920 was gross income for that year within the meaning of these sections cannot, we think, be doubted. The money

received was derived from a contract entered into in the course of respondent's business operations for profit. While it equalled, and in a loose sense was a return of, expenditures made in performing the contract, still, as the Board of Tax Appeals found, the expenditures were made in defraying the expenses incurred in the prosecution of the work under the contract, for the purpose of earning profits. They were not *capital investments*, the cost of which, if converted, must first be restored from the proceeds before there is a capital gain taxable as income. See *Doyle* v. *Mitchell Brothers Co.*, *supra*, p. 185.

That such receipts from the conduct of a business enterprise are to be included in the taxpayer's return as a part of gross income, regardless of whether the particular transaction results in net profit, sufficiently appears from the quoted words of § 213 (a) and from the character of the deductions allowed. Only by including these items of gross income in the 1920 return would it have been possible to ascertain respondent's net income for the period covered by the return, which is what the statute taxes. The excess of gross income over deductions did not any the less constitute net income for the taxable period because respondent, in an earlier period, suffered net losses in the conduct of its business which were in some measure attributable to expenditures made to produce the net income of the later period.

That is, it was immaterial that no net profit was involved of an excess of the amount received under the judgment over the expenses paid, and this fully answers the contention of the petitioner that " no gain or profit could arise from such a transaction unless and until the amount received should exceed the amount paid out." While it is only " net income " as determined on an annual basis that is subject to tax, " net income " as a specific item is not set out in the statute, but rather is a derivative item arrived at under the Revenue Act of 1918 as the difference between the items to be included in gross income and the deductions allowable therefrom. In view of the broad definition of gross income as set out in section 213 (a) of the Revenue Act of 1918 to include " gains or profits and income derived from any source whatever " and the definition of income as laid down in *Eisner* v. *Macomber*, 252 U. S. 189, to include the " gain derived from capital, from labor, or from both combined," we do not think it can be doubted, as the court said in the *Sanford & Brooks* case, that the recovery by the petitioner from the railroads constituted an item to be included in gross income. The cause of action through which recovery was made was a discriminatory wrong, but there was a discriminatory wrong because of the use of labor and the expenditure of capital by the petitioner without compensation therefor when its competitors either received payment from the railroads for rendering the service or had the service rendered for them without charge. Certainly, in the case where a competitor was paid for rendering the service, the amount received would have been includable in gross income, that is, would have constituted income, in the year in which it was received or accrued, and the expenditures made in rendering such services were ordinary and necessary expenses in the year in

which paid or incurred. We do not think a different rule can be applied to the petitioner. Of course, it may be desirable that income be balanced by the expenditures which produce such income to the end that only net income from a given undertaking may be taxed, but as the Supreme Court has said on many occasions (*Burnet* v. *Sanford & Brooks Co.*, *supra; Fawcus Machine Co.* v. *United States*, 282 U. S. 375; and *Burnet* v. *Thompson Oil & Gas Co.*, 283 U. S. 301, the scheme of taxation with which we are concerned is predicated upon annual periods and therefore it may well happen that expenses incident to the production of income will fall in one year and the income will not be received until another year. Under such circumstances, even though the net result, if combined in a single taxable period, might be a loss, this would afford no reason for relieving the taxpayer from tax for the year in which income was received.

The income here in question was received in 1920, but since the petitioner kept its books and rendered its returns on the accrual basis the question remains as to whether it can be said that the amount received had accrued prior to its receipt and therefore must be accounted for as income prior to 1920. The petitioner says that the right to the payment received in 1920 arose when the switching was done and was definitely determined in 1911 when the Interstate Commerce Commission entered its first order to the effect that the railroads were engaging is discriminatory practice to the detriment of the petitioner. With this we can not agree. The most that can be said of what occurred in 1911 is that the Interstate Commerce Commission then found that the discriminatory practice existed and issued an order commanding the railroads to desist from such practice, but left open the question as to reparation to be awarded on account of such damage as may have been suffered. It was not until 1917 that the Commission entered its final decree fixing the damage suffered and ordering the railroads to pay to the petitioner the cost of the services rendered by it. This order was not self-executing; if the railroads refused to pay, which they did, the petitioner's remedy was an action at law wherein the Commissioner's findings were prima facie, but not conclusive, evidence, subject to be overthrown by countervailing evidence. *Meeker & Co.* v. *Lehigh Valley Railroad Co.*, 236 U. S. 412, and *Atchison, Topeka & Santa Fe Railroad Co.* v. *Spiller*, 246 Fed. 1. Since the railroads refused to pay, the petitioner brought suits for collection, but before the suits came to trial a compromise was effected through which payment was made to the petitioner in 1920 of approximately one-half of the amount fixed by the Commission in full satisfaction of the damage suffered. Under such conditions, we are of the opinion that it was not known until 1920 what amount, if any, would be

recovered and therefore no basis for accrual existed prior to that time. *United States* v. *Anderson*, 269 U. S. 422, and *Lucas* v. *American Code Co.*, 280 U. S. 445. Whatever may be the rule laid down in *Park* v. *Gilligan*, 293 Fed. 129, on which the petitioner relies, we think it is to be distinguished from the case at bar, on the ground that the amount there in controversy was found by the court to have been an accrued chose in action as an asset on March 1, 1913, and therefore the conversion of this asset into cash in 1916 could not be considered income in 1916 of the cash then received, whereas we are of the opinion that no amount had accrued in the case at bar on March 1, 1913.

In view of the foregoing, we are of the opinion that the entire amount received by the petitioner from the railroads constituted income to it; that no basis for accrual of such amount existed prior to 1920, and therefore the action of the Commissioner in seeking to include the entire amount in gross income in 1920 should be sustained.

4. In the final issue the petitioner questions the correctness of the Commissioner's action in adjusting invested capital in each of the years before us in the manner provided in articles 845 and 845 (a) of Regulations 45 on account of income and profits taxes due and payable for the respective prior years. The Board has heretofore held that the validity of the regulations in question was made effective by section 1207 of the Revenue Act of 1926 (*Russel Wheel & Foundry Co.*, 3 B. T. A. 1168), and the same regulations were recently upheld by the Supreme Court in *Fawcus Machine Co.* v. *United States, supra.*

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH dissents.