Apollo Steel Company v. Commissioner.
Apollo Steel Co. v. Commissioner
Docket No. 3436.
United States Tax Court
1945 Tax Ct. Memo LEXIS 237; 4 T.C.M. (CCH) 387; T.C.M. (RIA) 45128; April 13, 1945
Louis Caplan, Esq., 1124 Frick Bldg., Pittsburgh, Pa., for the petitioner. Robert H. Kinderman, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency in Federal income, declared value excess-profits, and excess-profits taxes for the year 1941, as follows: Income tax
$ 5,847.94
Declared value excess-profits tax
82.96
Excess-profits tax
14,345.86
The issues are: 1. Whether petitioner is entitled to a deduction in the amount of $15,486.95 in 1941 as an addition to its reserve for bad debts. 2. Whether petitioner is entitled to a deduction of $10,000, or any other amount, for payment of its 1941 Pennsylvania State capital stock tax. 3. Whether petitioner is entitled to a deduction *238 of $1,004.10, or any other amount, as an ordinary and necessary repair expense, representing the replacement cost of 1,500 feet of electric cable. 4. Whether petitioner is entitled to a deduction of the sum of $6,066.14, or any other amount, as an ordinary and necessary repair expense, representing replacement cost of rotor bars and connections for an electric motor together with the cost of labor in installing same. 5. Whether petitioner is entitled to a deduction in any amount in 1941 for additional salaries to executives and heads of departments. A further issue, whether respondent properly disallowed a loss in the amount of $1,109.35, for unpaid interest involved in a real estate transaction, has been withdrawn by the petitioner. Certain facts were stipulated which are adopted as our findings of fact. Other facts are found from the evidence. General Facts Petitioner is a corporation organized under the laws of the State of Pennsylvania, having its principal office at 609 Warren Avenue, Apollo, Pennsylvania. Its return for the year 1941 was filed with the collector of internal revenue for the 23rd district of Pennsylvania, at Pettsburgh, Pennsylvania. Petitioner keeps *239 its books of account and makes its Federal income tax returns on an accrual basis. The facts and our conclusions upon the several issues will be treated separately. Issue 1. Findings of Fact The first issue relates to respondent's disallowance of the amount of $15,486.95 as an addition to petitioner's reserve for bad debts. Prior to 1940, petitioner used the actual charge-off method of reporting bad debt losses. In 1940 it requested and was granted permission to adopt the reserve method commencing with the calendar year January 1, 1940. Petitioner, with the approval of respondent, set up as a reserve for bad debts the sum of $11,779.75, which is.2 of one per cent of its gross sales for that year, against which it charged off in the year 1940 the sum of $5,221.17, leaving a net balance on December 31, 1940 of $6,558.58. Bad debts aggregating $1,292.82, representing sales made prior to January 1, 1940, were charged against this net balance in 1941, so that, on December 31, 1941, the net balance in the reserve for bad debts set up in 1940 was $5,265.76. On December 31, 1940, the outstanding accounts receivable owing to petitioner aggregated the sum of $682,413.57. The notes receivable *240 on that date aggregated the sum of $60,663.17. On December 31, 1941, the outstanding accounts receivable aggregated the sum of $419,751.92, and the notes receivable aggregated the sum of $38,336.74. Petitioner's gross sales for the years 1930 to 1940, inclusive, were as follows: 1930
$4,561,603.54
1931
2,693,075.22
1932
1,747,237.08
1933
3,135,133.71
1934
3,545,518.93
1935
4,606,475.94
1936
5,404,901.02
1937
6,346,203.88
1938
2,599,986.29
1939
4,253,419.93
1940
5,889,874.18
The bad debts charged off by petitioner for Federal income tax purposes for the years 1930 to 1939, inclusive, were as follows: 1930
$ 150.70
1931
000.00
1932
17,417.44
1933
30,000.00
1934
10,000.00
1935
24,362.75
1936
2,699.27
1937
23,204.45
1938
2,363.83
1939
6,146.33
Petitioner's gross sales for the year 1941 amounted to $7,743,476.41. For the five-year period 1935 to 1939, inclusive, the average loss on bad debts, as against sales, amounted to.19 of one per cent. The petitioner claimed as a deduction on account of an addition to its reserve for 1941 the amount of $15,486.95, i.e.,.2 of one per cent of its 1941 gross sales of $7,743,476.41. *241 As of December 31, 1941, petitioner had outstanding open accounts in the amount of $54,331.75, which it considered doubtful. It also had notes receivable due from the P. Wall Manufacturing and Supply Company in the amount of $33,000. These notes were outstanding in 1939 and prior thereto. Twenty-three thousand dollars of these notes were past due and one note for $10,000 was payable on demand. Petitioner, because of the debtor's financial condition in 1941, considered collection on these notes doubtful. The P. Wall Manufacturing and Supply Company, as of December 31, 1941, was delinquent in the payments on a mortgage of $63,883 on its plant, delinquent in the interest payments on the mortgage in the amount of $8,273, and delinquent on its real estate taxes in the sum of $7,514. This debtor company also had a navy contract on which, due to an error in cost calculations, it was losing money and by December 31, 1941 its loss on this contract was $15,000. The loss would have considerably increased had the Navy not consented to a cancellation of the contract in 1942. In the event either the mortgagee or the Navy had pressed their claims, bankruptcy would have resulted. Petitioner carried *242 credit insurance in 1940 and 1941, but no claim was made under such policies in either year. The P. Wall Manufacturing and Supply Company had no Dun & Bradstreet credit rating, and did not come within the provisions of the 1941 insurance policy. It has been stipulated that all accounts receivable, representing sales made by petitioner in 1941, have since been paid. An addition of $15,486.95 to petitioner's reserve fund in 1941 was reasonable. Opinion Petitioner was on the reserve method of treating its bad debt losses. Under section 23 (k) (1) of the Internal Revenue Code, any addition to its existing reserve is within the legal discretion of the Commissioner of Internal Revenue. On its 1941 Federal income tax return, petitioner claimed the amount of $15,486.95 or a ratio of 1/5 of one per cent of its gross sales of $7,743,476.41. The respondent denied any addition to petitioner's existing reserve of $5,265.76, as of December 31, 1941. In his deficiency notice, respondent states: * * * It has been held that the deduction of $15,486.95 claimed by you as the addition to your reserve for bad debts in the year 1941 was unallowable because all your accounts *243 receivable outstanding at December 31, 1941, were subsequently collected. What is a reasonable addition to a taxpayer's reserve for bad debt losses is a question of fact. The statute vests a discretion in determining what is a reasonable addition to such reserve. We are not at liberty to substitute our judgment for that of respondent unless we find from all the surrounding conditions existing at the time that respondent's determination is unsound. Here the respondent's determination was largely premised upon subsequent events. Since a bad debt reserve is but an estimate of probable future losses, the estimate for any year must be measured by the necessities as they appear at the time the estimate is made. C. P. Ford & Co., Inc., 28 B.T.A. 156. The record discloses that petitioner's gross sales increased in 1941 to $7,743,476.41, approximately $1,850,000 over its 1940 sales. It had $54,331.75 of open accounts and $33,000 of notes of a single debtor which were considered doubtful. The P. Wall Manufacturing and Supply Company, maker of the $33,000 of notes, in the taxable year was in unhealthy financial condition. Not only was it delinquent in its amortization payments *244 on its mortgage, but also delinquent in its mortgage interest payments and its real estate taxes. Furthermore, the testimony shows that this debtor had a contract with the Navy on which it was sustaining substantial losses. This contract was cancelled by the Navy in 1942, and with the general improvement of conditions in the steel industry following in the wake of the war, the debtor corporation was enabled to pay its past due notes to the petitioner. The respondent stresses these subsequent events as justifying his denial of any addition to petitioner's bad debt reserve in 1941. A discretion buttressed by hindsight does not meet the character of discretion the statute requires. We think the testimony amply justified the precaution exercised by petitioner's officers at the time they were called upon to make their estimate. When petitioner was granted permission to adopt the reserve method of treating bad debt losses in 1940, the respondent allowed a reserve of.2 of one per cent of its gross sales, based on its experience, to be set up by petitioner. A similar percentage was claimed in the taxable year. While this is not the proper criterion for determining the addition to a reserve *245 for a different year, C. P. Ford & Co., Inc., supra, nevertheless it is one of the factors to be considered. All the facts in the case must be considered in determining what constitutes a reasonable addition to the reserve. Transatlantic Clock & Watch Co., 3 B.T.A. 1064; Abraham Sultan et al., 22 B.T.A. 889. The unusual conditions confronting petitioner in the taxable year called for unusual measures. Rhode Island Hospital Trust Co. v. Commissioner, 29 Fed. (2d) 339. Respondent argues that we should not consider the circumstances respecting the P. Wall Manufacturing and Supply Company because petitioner owned more than 50 per cent of its capital stock and the loans and materials furnished by petitioner were additional contributions to its capital. W. F. Bavinger, 22 B.T.A. 1239; Warren E. Burns et al., 11 B.T.A. 524; B. Estes Vaughan, 17 B.T.A. 620. We do not regard the principle for which those cases stand as applicable here. An individual may be a creditor and a stockholder of a corporation at the same time. There were many other stockholders and the advances and credits made by petitioner *246 created a creditor and debtor relationship. We conclude that petitioner has sustained the burden of showing the amount of $15,468.95, claimed as an addition to its reserve for bad debts in 1941, was reasonable under the circumstances. On this issue we sustain the petitioner. Issue 2. Findings of Fact This issue relates to the deduction on account of Pennsylvania capital stock tax for 1941. Petitioner accrued but did not pay the sum of $10,000 as Pennsylvania State capital stock tax for the year 1941. It deducted that amount as taxes in its 1941 return. In 1942 petitioner was assessed and paid to the Commonwealth of Pennsylvania the sum of $7,243.50 as State capital stock tax for the year 1941. This was the entire amount of such taxes it paid for that year. Opinion At the trial petitioner offered in evidence the receipt from the Commonwealth of Pennsylvania showing the payment of its additional State capital stock tax for the year 1941 in the amount of $7,243.50. On brief the respondent concedes that petitioner has established its right to a deduction of that amount. Effect will be given to this concession in the computation to be made under Rule 50. Issue 3. Findings of *247 Fact This issue relates to a claimed deduction of $1,004.10, representing the cost of replacing 1,500 feet of electric cable. In 1941 petitioner expended $1,604.10 for replacement of an underground cable which had been damaged by the flood in 1936. Petitioner collected $600 insurance on its policy covering the damage, which amount was credited. Petitioner also received $90 from the cable company for the return of reels, making a net expenditure of $914.10. The cable carries the power from the substation to the motor. This cable is in three sections of 1,000 feet each, but was a single integral part of the installation. Its estimated life when installed was probably that of the plant. Part of the cable was damaged by the flood causing it to "blow up" at frequent intervals interrupting the operation of the machinery until repairs could be made. Because of the frequency of the "blow ups", petitioner decided to replace the patched cable with a new cable. The "blow ups" ceased after the installation of the new cable. The replacement of the damaged cable by the 1,500 feet of new cable did not appreciably add to the value, the efficiency or the life of the original cable. Opinion Petitioner *248 claimed a deduction of the cost incurred in connection with the replacement of the underground electric cable. The respondent disallowed this item as being a capital expenditure properly chargeable against the reserve for depreciation. The question is essentially one of fact. Commissioner v. Heininger, 320 U.S. 467; Buffalo Union Furnace Co., 23 B.T.A. 439, 456. Were the respective expenditures repairs or improvements? The pertinent Treasury Regulation is set forth in the margin. [1] The distinction between an expenditure properly classed as a repair and a capital outlay has been set forth with clarity in Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, where we said: * * * A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of *249 the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. We have already pointed out this distinction in the Appeal of Simmons & Hammond Manufacturing Co., 1 B.T.A. 803 [Dec. 296], in which we held that expenses properly chargeable to capital account include those which are incurred in the original construction of the work and in the subsequent enlargement and improvement thereof, and quoted the following from Union Pacific R.R. Co. v. United States, 99 U.S. 402, page 420: Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof. *250 The principles therein set forth have often been followed. Yakima Hop Co., 8 B.T.A. 441; Tampa Electric Co., 12 B.T.A. 1002; J. F. Wilcox & Sons, 28 B.T.A. 878; The Commodore, Inc., 46 B.T.A. 718, and many other cases. Applying the principles to the contested item respecting the replacement of a portion of the electric power cable necessitated by the damage caused by flood, we are of the opinion that the expenditure incurred was in the nature of a repair and not a capital improvement. The expenditure was necessitated by damage caused by a flood. The entire cable which transmitted the power was a single and integral part of the plant. The replaced cable did not appreciably increase the value or prolong the life or improve the efficiency of the cable as originally installed. The respondent argues that since the damage was caused by an unusual flood it constituted a casualty loss which should have been taken in the year damage occurred. Joseph E. Hubinger, 13 B.T.A. 960; Marble & Shattuck Chair Co., 13 B.T.A. 657 Those cases present a different situation. J. F. Wilcox & Sons, supra.We have *251 repeatedly held that repairs necessitated by casualty are deductible in the years the repairs are made. Tampa Electric Co., supra; The Commodore, Inc., supra.Under the circumstances the net expenditure, $914.10, is deductible as an ordinary and necessary business expense. The petitioner is sustained on this issue. Issue 4. Findings of Fact During 1941, petitioner expended the sum of $6,066.14 for rotor bar windings with connections for a motor in its main hot mill building. This repair consisted of rewinding the induction motor by replacing rotor bars on the main motor which had been worn by constant usage. The capitalized cost of the motor at the time of its acquisition on September 21, 1920 was $18,550. Additions to this account from time to time resulted in a total capitalized cost of $24,281.78 as of September 1, 1923. Depreciation was calculated by petitioner on a unit of production basis against the plant as a whole and not upon the normal useful life of each individual physical asset. It was not allocated to various items in the plant but charged to the general capital account. The motor was a single, integral unit of the plant. The replacement *252 of the rotor bars in the motor did not appreciably increase the value, prolong the life or increase the efficiency of the motor as originally installed. Opinion During 1941 the expenditure of $6,066.14 for rotor bar windings with connections for the electric motor was made by the petitioner. Much of what we have said in connection with Issue 3 applies with equal force to this issue. The repair consisted of replacing parts of a motor worn because of constant usage. The motor, as such, was an integral part of the plant. While the restored parts were important and constituted about 20 per cent of the entire motor, they did not add materially to the value, life or efficiency of the motor as originally installed. The superintendent of repairs from the General Electric Company who supervised the work and testified for petitioner, as well as the electrical engineer, who testified on behalf of the respondent, were in accord as to that fact. Accordingly, the cost was properly taken as an ordinary and necessary expense of the business and was not a capital expenditure. We sustain the petitioner on this issue. Issue 5. Findings of Fact This issue relates to the question whether petitioner *253 is entitled to deduct, as additional salaries, 15 per cent of certain of the amounts claimed on its returns as deductions for ordinary and necessary business expenses that respondent disallowed on the ground they were capital expenditures and which action is not here contested or approved. The basis of this position of petitioner is that at the annual meeting of the shareholders of petitioner held on February 3, 1941 the following resolution was adopted: "It was moved by Mr. Jameson and seconded by Mr. Shaw, and motion was carried, that a fund known as additional salary reserve shall be set aside out of earnings for the fiscal year 1941; said fund to be arrived at in the following manner: after a sum equal to 20 per cent of the outstanding stock of the company has been earned, before Federal taxes have been computed, 15 per cent of the remaining profits for the year shall be set aside and distributed on January 31, 1942. That sum is to be apportioned by the management and approved by the board of directors and is to be paid to such executives and heads of departments as decided upon." A distribution was made under that resolution on the basis of the net income as shown by the returns *254 for that year. Opinion Even assuming the resolution relating to additional salaries created a legal and binding obligation upon the petitioner, we think this issue must be determined adversely to the petitioner. The respondent made no determination on this issue in his deficiency notice. It was raised for the first time in the petition. At the opening of the hearing the respondent took the position that the additional salaries and bonuses so claimed as deductions had not been accrued, paid or deducted in 1941 and any addition to the salaries actually accrued or paid would be excessive and unreasonable. Unquestionably petitioner thus had the burden of showing that any additional amount that would become payable under such resolution, in the event its net profit for 1941 is increased by the disallowance here of certain deductions claimed as ordinary and necessary expenses, would not constitute unreasonable and excessive compensation. The only proof offered by petitioner on this issue is that set forth in our findings of fact. No attempt was made by petitioner to establish the fact that such additional salary and bonuses, together with the salary and bonuses which had already been *255 paid, or accrued and deducted, would constitute fair and reasonable compensations for the services rendered in 1941. The petitioner's argument that it necessarily follows that if its net income is increased by the disallowance of certain expense items, it automatically becomes liable to pay additional salaries and bonuses under the resolution, falls short of meeting the real issue. The respondent in not making any adjustment to the amount shown on petitioner's 1941 tax return as salaries paid or accrued did not thereby approve either the binding effect of the resolution or the reasonableness of the amount of the compensation that might be paid thereunder. He merely allowed x dollars as compensation paid or accrued. Although given ample notice that its claim, set out in its petition, for the allowance of a possible contingent liability under the resolution was contested, petitioner failed to meet its burden of proof. Petitioner is therefore not entitled to any relief under this issue. Decision will be entered under Rule 50. Footnotes
1. Regulations 103. Sec. 19.23(a)-4. Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the plant or property account is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve if such account is kept. (See sections 19.23(1)-1 to 19.23(1)-10, inclusive.)↩