Standard Asbestos Manufacturing and Insulating Company v. Commissioner. Alice D. Ryder v. Commissioner.
Standard Asbestos Mfg. & Insulating Co. v. Commissioner
Docket Nos. 60607, 60696.
United States Tax Court
T.C. Memo 1958-42; 1958 Tax Ct. Memo LEXIS 188; 17 T.C.M. (CCH) 207; T.C.M. (RIA) 58042; March 18, 1958
*188 1. Petitioner, Standard Asbestos and Insulating Company, paid to each of its three officers for services rendered during the years 1949, 1950 and 1951, the sums of $52,232.14, $65,290.17 and $65,290.17, respectively. The officers and their families collectively held the majority of the stock in the corporation. They performed all the duties of the major officers of a corporation and estimated, bid, and supervised the work on all contracts of over $5,000. During the 1920's and 1930's their compensation was small. Evidence was presented, inter alia, of the compensation paid to officers in other companies in the industry. Other pertinent financial data, both with respect to petitioner company and with respect to other companies in the industry, was submitted. Held, on the facts, none of the compensation paid during the years in question was intended as compensation for services rendered in prior years. Held further, that the compensation paid to the officers in question for the years 1949, 1950 and 1951 was unreasonable to the extent herein determined. 2. Petitioner company paid $13,012.50 to petitioner Alice D. Ryder, widow of its deceased president, which amount represented the probable *189 amount of bonus which the president would have drawn for the first quarter of 1949, had he been alive at the end of the year, when bonuses were being determined. The president died on April 1, 1949, and before that date was the active head of the corporation. No employment contract existed between the company and the president, and there was no obligation for the company to pay the amount to his widow. Alice Ryder performed no services for the corporation and became a director of the corporation after the amount had been decided upon and accrued on the corporation's books. The amount was paid directly to her, and not to her husband's estate. The corporation deducted the amount on its return for 1949 as a payment to W. E. Ryder, and Alice Ryder included the amount in income in the year of receipt, 1950. Held, the amount represented a gift and was not includible in Alice Ryder's income for 1950. 3. The corporation had 500 shares of stock outstanding. During the years 1949-1951, inclusive, 446 1/2 of these shares were held by members of the Ryder family. Of the remaining shares, 26 3/4 were held by E. McElreath, the assistant secretary of the corporation, and 26 3/4 by Charles C. Knapp. *190 These parties (other than Knapp) entered into a contract under date of February 17, 1949, in which they agreed to certain restrictions on the transfer of their stock. The agreement provided in part that should any of the Ryder brothers or their father die and leave their stock to their widow, or should the widow inherit any of their stock, the stockholders would cause the company to pay the widow, quarterly, 50 per cent of the average of the salaries of the father and brothers during the preceding quarter, so long as the widow held the stock. Pursuant to this agreement, the stockholders caused the company to pay to Alice Ryder the amount called for in the agreement. Held, the amounts were not deductible by the company, and were properly includible in Alice Ryder's income. 4. The respondent determined additions to the income tax of Alice Ryder for the year 1950 under sections 294(d)(1)(A) and 294(d)(2). Alice Ryder failed to file declaration of estimated tax for 1950. Held, that Alice failed to meet the burden of proving reasonable cause for failure to file such declaration and that additions to tax under the sections referred to are applicable. Harry H. Ellis, Esq., Argyle Building, *191 Kansas City, Mo., for the petitioners. Claude R. Sanders, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: In these consolidated proceedings respondent determined deficiencies in income taxes and additions to the taxes of petitioners as follows: Docket No. 60607
Year
Deficiency
1949
$19,644.67
1950
40,843.10
1951
56,432.34
Docket No. 60696
Additions to Tax Under
Sec.
Sec.
Year
Deficiency
294(d)(1)(A)
294(d)(2)
1950
$11,128.84
$1,444.66
$963.10
1952
5,168.43
Many of the issues have been conceded by one or another of the parties, which will require entry of decision under Rule 50 in any event. The issues still contested are: (a) The reasonableness of compensation for services rendered by three of the officers of petitioner, Standard Asbestos and Insulating Company, in the years 1949, 1950, and 1951; (b) Whether amounts accrued by petitioner Standard Asbestos and Insulating Company, in 1949, 1950, and 1951, and paid to petitioner Alice D. Ryder in 1950 and 1952, are properly deductible by petitioner Standard Asbestos and Insulating Company, and properly excludible from the taxable income of petitioner Alice D. Ryder; (c) Whether or not the payment by petitioner Standard *192 Asbestos and Insulating Company to petitioner Alice D. Ryder of $13,012.50 was excludible from Alice D. Ryder's taxable income in 1950, the year of receipt; (d) Whether or not petitioner Alice D. Ryder is liable for additions to tax under section 294(d)(1)(A); (e) Whether or not petitioner Alice D. Ryder is liable for additions to tax under section 294(d)(2). Findings of Fact Some of the facts have been stipulated, either orally or in writing, and are incorporated herein by this reference. Salary Issue Petitioner, Standard Asbestos Manufacturing and Insulating Company (hereinafter sometimes referred to as Standard), is a corporation organized in 1918 under the laws of the State of Missouri. Its original capitalization, which has not changed through the years, was $50,000, consisting of 500 shares of stock at a par value of $100 each. Standard was incorporated to do a general asbestos and insulating business and has developed into a technical specialities contractor organization handling all or part of the specifying, fabricating, manufacture, cost estimating, erection and surface finishing in connection with highly technical construction work involving insulation, air conditioning, *193 and temperature control installations. In performing such work, petitioner employs engineers, draftsmen, salesmen, district supervisors, superintendents, and various classes of skilled and unskilled labor. Petitioner's average number of employees during the years 1949, 1950 and 1951 (the years in question), was between 450 and 500, but because much of this labor was temporary and transient, obtained at the work site, the total number of persons working for petitioner at one time or another during the years in issue was approximately 1,500 to 1,600 persons. At all times material hereto Standard was on an accrual basis of accounting. It filed its corporate income tax returns for the calendar years 1949, 1950 and 1951 with the collector of internal revenue for the eighth district of Missouri. Standard's officers during the years 1949, 1950 and 1951 were Willard D. Ryder, president (acting president in 1949); George M. Ryder, treasurer and vice president (1950-51); Richard E. Ryder, secretary; and E. McElreath, assistant secretary. These persons, along with petitioner Alice D. Ryder (1950-51), also constituted the board of directors. Williard E. Ryder was the father of Willard D., George *194 M., and Richard E. Ryder, and the husband of Alice Ryder. Before coming to Kansas City in 1901, he had had experience in the insulation field as factory superintendent for Chicago Fire Proof Covering Company. After arriving in Kansas City, he entered into partnership with three others, doing business as Midland Asbestos Manufacturing Company. This partnership operated until the end of 1912. In 1913, Willard E. Ryder entered into partnership with Ben C. Naylor, doing business as Standard Asbestos Manufacturing and Insulating Company. All the brothers worked for this partnership, both Willard D. and George working in the factory and in various manufacturing departments, and Richard, only 11 or 12 years of age, working at more menial tasks. The corporate petitioner, Standard, was formed with the proceeds of insurance received when the partnership burned out in 1918, and with capital received from Mrs. E. P. Conger. The original stockholdings were in the following amounts: Willard E. Ryder
5 shares
E. P. Conger
354 shares
W. D. Ryder
61 shares
Ben C. Naylor
60 shares
Geo. M. Ryder
20 shares
Total
500 shares
Willard E. Ryder was elected the first president of the corporation and remained its president *195 and chairman of the board of directors until his death on April 1, 1949. He was at all times before his sickness the actual head of the business. The corporation grew considerably in size over the years. Its sales volume for the year 1918 was $41,826.31. For the year 1951 it was $3,565,763.92. By the year 1925, the Ryder family acquired a majority of the stock of the company. The stockholders of the corporation during the years 1949-1951 were as follows: Owner
Amount
Willard E. Ryder
41 1/2
Alice D. Ryder (wife)
6
Willard D. Ryder
66 1/2
Merle H. Ryder (wife)
66 1/2
George M. Ryder
86
Iris B. Ryder (wife)
47
Richard E. Ryder
66 1/2
Hazel M. Ryder (wife)
66 1/2
Elizabeth McElreath
26 3/4
Charles C. Knapp
26 3/4 George, Willard and Richard Ryder have had long and outstanding careers with the company. They all worked for the company in various capacities immediately after its incorporation, and by the late 1920's were obtaining inquiries from substantial customers, securing large contracts, estimating jobs, bidding on them, closing contracts, supervising work in the field, collecting accounts, and, when necessary, designing new installations and equipment. After the death of Willard E. Ryder, his duties were *196 divided with substantial equality among the three brothers. They continued to perform his duties through 1951. From the date of his father's death, Willard D. Ryder held the office of president (acting president in 1949). His duties in this capacity included acting as sales manager, engineering director, Kansas City district manager, and Denver district manager. In addition, he accepted all contracts for the company, helped determine cost prices and selling prices, was responsible for billing and invoicing, determined estimating procedures, and performed the ordinary duties of president of a corporation. George M. Ryder, after his father's death, became general office manager, in which position he was responsible for the financial relations of the company, its supplier and distributor relations, its customer credit limits, all accounting (including cost accounting), purchasing, collections, and company disbursements. He was also vice president and treasurer of the corporation and helped determine costs and selling prices. Richard E. Ryder, after his father's death, was directly responsible for all requisitions, job supervision, and field supervision in the Gulf and south central area *197 of the United States. His duties included the supervision of work, and the responsibility for branch payrolls and expense accounts. He was secretary of the company, and assisted in estimating work, and in developing new products. During the years in question, Richard suffered from a heart condition, and underwent surgery in 1950. After a recuperative period of three months, he again resumed his duties. While the company employed branch managers, supervisors, draftsmen, engineers, salesmen and the like during the years in question, all employees were under the direct supervision of at least one of the brothers. No one other than the three Ryders was allowed to handle contracts amounting in sales price to over $5,000. The estimating, bidding, and supervision of contracts in excess of that amount were handled by either George, Willard, or Richard. The Ryders also obtained most of the inquiries on substantial contracts, although occasionally others in the organization helped in that regard. During the years in question no employee of Standard other than officers was paid more than $9,000 per year. Each of the brothers devoted greatly in excess of 40 hours per week to the business during *198 the periods here material. Defense work performed by the company during the Korean War amounted to between 25 per cent and 33 per cent of sales for each of the years 1950 and 1951. The company's performance was highly complimented by the Renegotiation Board, which approved the maximum profit allowable to contractors. The Board did not question the brothers' compensation. The brothers drew currently $70 per week during the years in question. The remainder of their compensation was paid to them in the form of a bonus. The compensation deducted by Standard in 1949, 1950, and 1951 was authorized by the board of directors as follows: "Minutes of October 3, 1949: "In consideration of the constantly increasing volume of business being handled by the Company and recognizing the resultant increase in responsibility levied upon the officers, multiplying the demands upon their time, their energies, etc., it is directed that compensation to officers and key personnel be authorized and approved up to, but not to exceed, the following annual amounts: W. D. Ryder, Acting Presi-
dent
$67,500.00
R. E. Ryder, Secretary
67,500.00
G. M. Ryder, Treasurer
67,500.00
E. McElreath, Assistant Secre-
tary
15,000.00
Branch Managers, drawing ac-
counts
8,500.00
Superintendents, drawing ac-
counts
8,000.00
*199 Any salary adjustments shall be handled individually and at the studied discretion of the Acting President, but in any event, all such salaries must be held within the maximum limits herein established and must be, in the opinion of the Acting President, consistent with the earning of the Company." In the minutes of December 1, 1949, after a report on the "highly satisfactory financial condition of the company," and approval of a 10 per cent dividend, the following motion was adopted: "in view of the report just submitted by the Treasurer, that additional salary be paid to all officers for the year 1949, in keeping with the increased earnings of the Company and that such additional salary be in the amounts as determined and designated by Acting President of the Company, W. D. Ryder, and within the limits previously authorized by the Board of Directors." The compensation authorized by the president for the year 1949, payable to each brother pursuant to these minutes, was $52,234.14. The minutes of July 3, 1950, contain, inter alia, the following: "G. M. Ryder, Treasurer, reported that a tentative appraisal of Company's cash position at close of first half of 1950 fiscal year, indicated *200 the following: Cash on hand
$361,000
A/cs Receivable
294,000
A/cs Payable
49,000
Bank Loan
60,000
Houston Property Loan
11,000
"Thus reflecting a highly satisfactory liquid condition, and in addition, the existence of a very gratifying back-log volume, all of which conceivably should result in a profitable 1950 year. "R. E. Ryder moved, that in-as-much as the Company's finances indicated a sound liquid status that in view of the increasing time and effort expenditure being required of the officers, in the administration of Company affairs, and in line with increases already granted to the executive and supervisory employees at the various offices, that compensation of all officers for the 1950 year be increased up to 25% beyond the compensation paid the officers for the 1949 year. The exact percentage increase to be designated by the President, with the 25% figure to maintain as maximum." The minutes of December 4, 1950, report "as to the present highly satisfactory financial condition" of the company. The following motion was thereupon adopted: "in view of the report just submitted by the Treasurer, that additional salary be paid to all officers for the year 1950, in keeping with the increased *201 earnings of the Company and that such additional salary be in the amounts determined and designated by the President of the Company, Willard D. Ryder, and within the limits as previously authorized by the Board of Directors." The amount of compensation authorized by the president to be payable to each of the three brothers for the year 1950 was $65,290.17. The minutes of October 10, 1951, contain a report on the financial condition of the company, stressing the fact that large amounts of assets were tied up in accounts receivable for the rest of the year, and extending into 1952. The minutes continue: "Based upon the above report, R. E. Ryder then introduced the following Motion: 'In consideration of the fact that profits for 1951 operations evidence substantial proportion, but in-as-much as it is early to definitely calculate a probable total, that additional compensation be paid to all officers - in amounts as established and instructed by President W. D. Ryder, it being understood, however, that resulting total compensation will not exceed total for the year 1950; and that full consideration be given by W. D. Ryder to determined profits and cash requirements in keeping with the *202 needs of the business, in arriving at compensation amounts.'" By the authority stated in the above minutes, the president fixed compensation for 1951 at $65,290.17, the same amount as for 1950. The parties have stipulated that compensation paid to Richard, George, and Willard, respectively, during the long period the brothers served Standard was dependent upon the cash position and the financial condition of the company. The compensation was also dependent on the earnings and profits of the corporation. As early as December 31, 1921, the board of directors of petitioner corporation gave authority to the chairman of the board to set aside additional compensation as bonus to officers and heads of departments "as the profits resulting from the business may warrant, in the judgment of the managing directors," except that additional compensation be made available "only as the financial condition of the Company may be in condition to conveniently allow such withdrawals." In 1928, because the company was short of working capital, losing money, and raising the quality of the company's product, the board resolved that the president could curtail drawing accounts and that the authority to allow *203 additional compensation as bonus be withheld temporarily, "until, and providing business conditions improve to such extent that board can feel justified in allowing such withdrawals on compensation account without the hazard of continued losses." The authority to allow bonuses was withheld until 1937. During the period between 1928 and 1937, the compensation paid the brothers by Standard was very small, amounting to as little as $910 each per year in 1933 and 1934. By motion of December 20, 1937, the board voted to resume bonuses and pay back bonuses (theretofore suspended) for the years from 1928 on. Authority was given at the same time to make present payment of bonuses for the years 1928, 1929, and 1930. In 1938 and 1939, the salary of each of the brothers was supplemented by amounts considered to be due them as salary (bonus) withheld in back years. Willard D. Ryder left Standard in 1922 to work for Armstrong Cork Company. He returned to Standard in 1927. When he left Armstrong Cork he was being paid $360 per month. His salary upon his return to Standard was $205approximately per month. He returned because of the influence exerted by his father and brothers who persuaded him that *204 the four Ryders could go a lot further together than individually, and that if the compensation was then low, it would not always be so. In 1929, George M. Ryder was loaned to Barrett Company, who paid him $400 per month. At this time his salary from petitioner was $40 per week or $2,080 per year. While with Barrett, that company offered George an increase from $400 to $500 per month if he would stay in its employ. George refused the offer, due mainly to influence exerted by his family persuading him that his place was in Kansas City. Willard E. Ryder intended that when the company's sales volume reached $1,000,000 the salary paid to the brothers would be increased to some point which would be consistent with what was being paid in the industry. This goal was reached in 1941. The following schedule shows the sales volume of the company from 1942 to 1951, inclusive, the aggregate amount of compensation authorized by the board and paid to the brothers for services, (each received the same amount), the aggregate amount received by the brothers before the end of the years in which the work was performed, and the aggregate amount allowed and disallowed by respondent for the years in question: *205 Authorized and
Received
Year
Sales Volume
Deducted
During Year
Allowed
Disallowed
1942
$2,055,312.68
$ 45,000.00
$32,460.00
1943
2,690,437.27
60,000.00
60,000.00
1944
1,149,537.94
45,000.00
45,035.01
1945
1,600,037.11
52,465.00
44,964.99
1946
1,653,529.33
37,500.00
17,730.00
1947
1,751,199.34
60,000.00
5,460.00
1948
2,402,590.17
90,000.00
42,280.80
1949
2,633,679.78
156,696.42
41,340.00
$105,000
$51,696.42
1950
2,578,287.24
195,870.51
57,515.01
120,000
75,870.51
1951
3,565,763.92
195,870.51
10,920.00
120,000
75,870.51 Each brother's 1940 compensation was $2,100. This amount was increased by the board to $11,000 each in 1941 because the board recognized that the officers had received inadequate salaries prior to that time as part of the plan to bring the company "to its present financial status," and to allow it to accumulate working capital. In 1942, as indicated by the minutes, the board increased the maximum compensation to each brother to $20,000 in recognition of the low salaries paid theretofore, and because the company was doing a larger volume with the same overhead so that earnings would be up. The sum of $15,000 each was the amount finally paid to the brothers for that year. In 1943, salaries were frozen, and the amount paid *206 the brothers was the maximum provided in 1942. The 1946 salary was reduced because of the company's then unfavorable cash position. The 1947 salary was increased because of the company's then favorable cash position. The amounts paid during each of the years 1949, 1950, and 1951, the years in question, were intended to compensate only for services performed during each of those years. No arrangement, agreement, or understanding existed between Standard and the Ryders that any part of the compensation paid them for the years 1949-1951, inclusive, was to be in payment for services performed in prior years, nor did any amount paid for each of said years represent such payment. The compensation for 1949 was determined in the following manner. First, the 1942 compensation was increased by a factor of 2.5, which represented the parties' estimate of the increase in labor cost over 1942. To the resulting amount was added the amount which Willard E. Ryder would have been paid for the last three quarters of 1949, based upon the same formula. (The amount Willard E. Ryder would have been paid for the first quarter of 1949 is discussed in connection with petitioner Alice Ryder.) The total derived *207 by the above computations was divided equally among Willard, George and Richard. The compensation for 1950 and 1951 was determined by increasing 1949 compensation by 25 per cent. Pertinent operating and financial data of petitioner for the years 1942-1951, inclusive, is [are] as follows: Gross
Year
Net Sales
Profit *
Net Income *
1942
$2,055,312.68
$538,233.16
$266,200.92
1943
2,690,437.27
696,549.94
334,677.61
1944
1,149,537.94
378,307.02
99,308.73
1945
1,600,037.11
388,562.20
121,565.51
1946
1,653,529.33
413,422.03
107,476.14
1947
1,751,199.34
437,612.41
139,208.26
1948
2,402,590.17
548,212.68
232,105.81
1949
2,633,679.78
743,445.71
397,126.93
1950
2,578,287.24
846,186.49
451,098.62
1951
3,565,763.92
803,181.38
351,045.82
Officers'
Net Income
Year End
Salaries
After Of-
Year
Surplus
Deducted
ficers'
Salaries
1942
$296,294.64
$ 65,000.00
$201,200.92
1943
338,852.32
85,000.00
249,677.61
1944
387,507.39
65,000.00
34,308.73
1945
407,526.83
74,953.32
46,612.19
1946
431,985.27
60,000.00
47,476.14
1947
457,029.10
90,000.00
49,208.26
1948
509,969.16
135,000.00
97,105.81
1949
627,794.65
182,008.92
215,118.01
1950
710,474.79
209,933.01
241,165.61
1951
752,999.88
209,933.01
141,112.81
The ratio which the brothers' compensation bears to net sales and to net *208 income before salaries, and the ratio which total officers' salaries bears to net sales and to net income before salaries is indicated in the following schedule: Brothers'
Brothers'
Officers'
Compen-
Com-
Officers'
Compen-
Year
sation
pensation
Salaries
sation
Net
Net
Net
Net
Sales
Income
Sales
Income
1942
2.2%
17%
3.1%
24%
1943
2.2%
18%
3.2%
25%
1944
3.9%
45%
5.7%
65%
1945
3.3%
43%
4.7%
61%
1946
2.3%
35%
3.6%
55%
1947
3.4%
43%
5.1%
64%
1948
3.7%
39%
5.6%
58%
1949
6 %
39%
6.9%
46%
1950
7.2%
43%
8.1%
47%
1951
5.5%
56%
5.9%
60% Petitioner paid dividends in 1941 of $7,500. In 1942, it paid no dividends and in each of the years 1943 to 1951, inclusive, it paid dividends of $5,000. The Asbestos and Magnesium Materials Company of Chicago is a corporation engaged in the same general line of work as Standard. Pertinent financial data of the corporation for the years 1949-1951, inclusive, is set forth below: [1]
Officers' Salaries
Total Salaries
Year
Gross Sales
President
Vice President
Treasurer
Gross Sales
4/30/49
$4,000,000
$80,000
$55,000
$20,000
3.9%
4/30/50
5,500,000
80,000
30,000
10,000
2.2%
4/30/51
4,450,000
80,000
30,000
10,000
2.7%
4/30/52
4,270,000
80,000
32,000
10,000
2.9%
The president of Asbestos and Magnesium Materials *209 Company during 1949-1951, inclusive, founded the company in 1920. He had 10 years experience at the time the company was organized and put in more than 48 hours a week in the business during the years in question. The vice president of the company in 1949 had had 25 years exeperience and worked in excess of 48 hours a week with the company. The vice president in 1950 and 1951 had 28 or 29 years experience and had been treasurer of the company in 1949. The treasurer of the company in 1950 and 1951 had had experience in the accounting and investment field and was with the company about 10 years. Two men with 15 to 20 years experience each, who did only sales work for Asbestos and Magnesium Materials Company, and who were paid on a commission basis, averaged $40,000 to $45,000 per year each during the years 1949-1951, inclusive. Asbestos and Magnesium Materials Company paid dividends of $50,000 in each of the years 1949 to 1951, inclusive. It had a capitalization of $500,000 consisting of 5,000 shares of common stock with a par value of $100 each. The president owned about 95 per cent of the stock. The Kelley Asbestos Products Company is a corporation engaged in the same general line *210 of work as Standard. Pertinent financial data of the corporation for the years 1949-1951, inclusive, is set forth below: Net
Presi-
President's
Divi-
Year
Net Sales
Gross
Income *
dent's
Salary
dends Paid
Profit
Salary
Sales
1949
$1,336,440.40
$277,883.21
$ 73,033.04
$16,000
1.1%
$ 9,354
1950
1,458,206.17
263,600.53
36,155.54
26,000
1.7%
**
1951
2,274,774.09
520,790.94
259,136.53
26,000
1.1%
12,896
Kelley Asbestos Products Company had approximately 1100-1300 shares of stock outstanding during the years in question, with a par value $100, of which David E. Kelley, the president, owned 1,000 shares. David Kelley has been in the business since 1912, and in 1932 formed the present organization which was operated as a partnership until 1947. The compensation paid by Standard to George, Richard and Willard for each of the years 1949, 1950 and 1951 was in excess of reasonable as to each for the services rendered. Reasonable compensation for services rendered by each of the brothers was $42,500 for the year 1949 and $47,500 for each of the years 1950 and 1951. Payment of $13,012.50 Willard E. Ryder died on April 1, 1949. Prior to that time he had been the active *211 head of the business. His compensation, like that of his sons, was not fixed by written contract with the company, but, since at least 1941, was fixed each year on the basis of the financial condition and the earnings of the company for the year. His compensation was ordinarily 20 to 25 per cent greater than that paid to each of his sons. Willard E. Ryder, by his usual drawings of $70 per week received $1,050 from the company as compensation for the first 15 weeks of 1949. At the close of that year, when compensation to officers was being determined, the company paid to Alice Ryder $13,012.50, which sum represented the bonus, or compensation, which Williard E. Ryder would have received for the first quarter of 1949 under the formula outlined supra, whereby the 1942 salaries were increased by a factor of 2.5. There is no evidence of any action by the board of directors authorizing this payment. There was no obligation on the part of the company to pay any amount to Alice Ryder, as widow of Willard E. Ryder. Willard E. Ryder was the first officer of the company to die, and this marked the first time on which there was occasion to consider death benefits to the wife of a deceased officer, *212 although retirement benefits had been paid to other employees as the occasion arose. (See infra.) The amount of $13,012.50 was accrued by the company and deducted on its return for 1949 as part of a payment to W. E. Ryder. The amount was actually paid on March 4, 1950, to Alice, who reported her income on the cash basis, and included the amount in her income tax return for 1950. At no time did Alice render services to the company except as director. She was elected a director in January 1950, after the payment to her had already been determined. She owned 47 1/2 shares of the company's stock out of a total of 500 shares outstanding prior to and at the time the amount in question was accrued and paid. The officers of the company intended the payment to be a gift. The amount of $13,012.50 paid by the company to Alice Ryder represented a gift from the company to Alice Ryder. Pension Issue On February 17, 1949, an agreement which, inter alia, gave an option to the named stockholders to purchase the stock of other named stockholders under certain contingencies, was entered into among the parties stated, and included the following provisions: "AGREEMENT "THIS AGREEMENT, made and entered *213 into this 17th day of February, 1949, by and between W. E. Ryder, Alice D. Ryder, Willard D. Ryder, Merle H. Ryder, George M. Ryder, Iris B. Ryder, Richard E. Ryder, Hazel M. Ryder and E. McElreath (hereinafter sometimes separately referred to as a 'Stockholder' and collectively referred to as the 'Stockholders'), "WITNESSETH: "WHEREAS, the Stockholders presently or prospectively own substantially all of the common capital stock (hereinafter referred to as the 'Shares') of Standard Asbestos Manufacturing and Insulating Co., a Missouri corporation (hereinafter referred to as the 'Company'), and "WHEREAS, the Stockholders have agreed among themselves with respect to certain restrictions upon the transfer of the Shares, and desire to reduce said agreement to writing; "NOW THEREFORE, in consideration of the premises, the mutual covenants herein contained, and the mutual benefits to be derived herefrom, the sufficiency of such consideration being hereby acknowledged, it is understood and agreed betwen the parties as follows: * * *
"ARTICLE III "If W. E. Ryder, Willard D. Ryder, George M. Ryder, or Richard E. Ryder shall leave all of his Shares to or for the benefit of his widow in his Last *214 Will and Testament, either outright or in trust for her life, or if all of such Shares shall descend to such widow by operation of law, the Stockholders will cause the Company to pay a pension to such widow so long as she retains all of such Shares (or such trust continues and the trustee retains all of such Shares) and she does not remarry. Such pension shall be paid quarterly, and shall be the equivalent of 50% of the average of the salaries paid by the Company during the preceding quarter to W. E. Ryder and his lineal descendants." * * *
Standard was not a party to this agreement. Pursuant to the terms of the agreement, the shareholder-signatories thereto, who owned 473 1/4 shares of the 500 shares outstanding, caused the corporation to authorize payment to Alice Ryder of the amount called for by Article III thereof by unanimously adopting a motion which was recited in the minutes of July 5, 1949, as follows: "The Chairman advised the Board of Directors that, pursuant to Article #3 of an Agreement executed by the stockholders of the Company on February 17, 1949, Alice D. Ryder, widow of our late President, W. E. Ryder, was entitled to a pension from the Company equivalent to 50% *215 of the average of the compensation paid by the Company to the lineal descendants of W. E. Ryder.A motion was made by G. M. Ryder that the terms of said contract be complied with and that the Treasurer be instructed to pay such pension to Alice D. Ryder, beginning as of April 1, 1949, and to pay the same semi-annually or quarterly, as the Treasurer may elect, such payments to continue until the further order of this Board." During the years in question the amounts Alice Ryder received pursuant to the agreement and motion, as set forth above, along with the amounts she reported in her income tax returns are shown below: Reported
Received
1950
$ 6,876.44
$27,367.40
1952
28,225.00
32,645.09
Respondent increased Alice Ryder's income by the amount of $20,491.08 for the year 1950, and $5,300.08 for the year 1952, on account of the payments received by her by virtue of the aforesaid agreement and motion. Respondent now concedes that $1.88 for 1950 and $909.99 for 1952 were erroneously included in Alice Ryder's income. Standard accrued the amounts payable to Alice on its books each year. Small amounts were paid in each year of accrual, the balance being paid in the succeeding year. No deduction for *216 the amounts accrued was taken by the company on its income tax returns for the years in issue. The company made retirement payments to employees which, with social security, amounted to 50 per cent of their average yearly salary during the years they worked for the company. The amounts paid to Alice by Standard, pursuant to the agreement and motion of the board of directors, constituted a distribution of profits and not a pension. Issue re Additions to Tax Alice Ryder was 84 years old in 1950. Her income tax returns were prepared by Edwin J. Yentzer, a certified public accountant, who also did work for Standard. Alice Ryder did not file a declaration of estimated tax or pay an estimated tax for the year 1950. Opinion Salary Issue With respect to the reasonableness of the salaries deducted by Standard in 1949, 1950 and 1951, petitioner argues alternatively that the compensation included amounts intended to reimburse the brothers for services performed in prior years, or that the compensation was reasonable on the basis of services performed by the brothers in the years in question. We think it clear from the record that petitioner has failed to establish that the compensation deducted *217 in 1949, 1950 and 1951 had any ascertainable relationship to services performed in prior years. The years in which the brothers received a low income from the corporation were in the period of the 1920's and 1930's. During this time the brothers chose to work for Standard rather than other companies though they had ample opportunity to work for others. Whether or not their choices were prompted by understandings that when the company was in a position to pay larger salaries the brothers would be compensated for any year at a rate in excess of the value of their services to the company during that year, there is no evidence that part of the compensation authorized for 1949, 1950 and 1951 was so intended. Cf. Lucas v. Ox Fibre Brush Co., 281 U.S. 115. Petitioner relies on the following testimony in the record: By George M. Ryder [with reference to Willard's return in 1927]: "My younger brother and my father cornered him and talked him into coming back into the business with the promise that although he would temporarily have to work for less money than he was drawing, that as the business was built up he would be reimbursed for the time at which he drew lesser money." By Willard D. *218 Ryder [with reference to his return in 1927]: "They pointed out that we could go a whole lot farther together than we could individually, and they promised that later on it would be made up to us." By Willard D. Ryder [with reference to his father's attitude towards compensation]: "His position was always, when your volume reached a million dollars we could talk about it then, we could talk about salaries to some point which was relative with what was being paid in the trade." We note that there is some difference between George's third party account of what was promised to influence Willard to return, and Willard's much less definite account of the same promises. We note, more significantly, that in describing his father's attitude, Willard clearly states that his father's position was always to bring salaries into line with going rates in the industry when the million dollar volume was reached. When all of the above testimony is examined, along with the minutes of the corporation in 1928, 1937, and 1939 (referred to in our Findings), first withholding extra compensation and then allowing reimbursement for the amounts withheld, and when consideration is also given to the testimony *219 that the amounts authorized by the minutes for reimbursement were paid, we think that the evidence negatives petitioner's argument to the effect that part of the compensation received in each of the years 1949, 1950 and 1951 was intended as reimbursement for services performed in prior years. Especially is this so when it is considered that compensation for the years 1941-1948, inclusive, is substantial; that the minutes for 1941 and 1942 indicate that some part of the compensation paid for that period was intended as reimbursement for prior years' services; and that the minutes authorizing compensation for 1949, 1950 and 1951, make no mention of an intention to reimburse for prior years' services, but on the contrary, indicate that compensation was determined on the basis of then existing conditions. It should be recalled, also, in this connection that the Ryders controlled the company. For these reasons we hold that the compensation in question was intended to be paid for services rendered in the year for which the compensation was authorized, i.e., each of the years 1949, 1950 and 1951. In any event, it is clear that petitioner has failed to carry its burden of proving the contrary. *220 See E.B. & A. C. Whiting Co., 10 T.C. 102, 117, 118 (1948). We recognize that it is not an unreasonable business practice "for an employer to recognize and reward sacrifices made by employees in the hard formative days by granting a more generous compensation in the days that are lush." Commercial Iron Works v. Commissioner, 166 Fed. (2d) 221, 224, (C.A. 5, 1948). There is, however, no indication that petitioner here so intended for the years in question and, as we have said, we think the evidence points the other way. Cf. Christman Co., 8 T.C. 679 (1947), affd. on other grounds 166 Fed. (2d) 1016, (C.A. 6, 1948). We consider, therefore, whether or not the compensation in question was reasonable in the light of the services rendered by the brothers during the years in question. In determining the reasonableness of salaries, all the elements of the particular case must be considered as disclosed by an analysis of the record. Heil Beauty Supplies v. Commissioner, 199 Fed. (2d) 193 (C.A. 8, 1951), affirming a Memorandum Opinion of this Court dated December 13, 1950 [9 TCM 1125,; The Barto Co., 21 B.T.A. 1197 (1931)]. The minutes of the company indicate that the board of directors *221 considered the compensation reasonable. While the decision of the board is a factor to be considered, it is not, of course, controlling upon us, but it is to be weighed in the light of all of the circumstances of the case. L. Schepp Co., 25 B.T.A. 419, 429 (1932). The action of the board must be examined closely, particularly in a case involving the reasonableness of salaries paid to officers in a closely held corporation in which the officers are also the majority shareholders and directors, with a view to determining whether or not any part of the amount designated as salaries may in fact represent a distribution of profits under the guise of compensation. Miles-Conley Co. v. Commissioner, 173 Fed. (2d) 958, 960 (C.A. 4, 1949), affirming 10 T.C. 754; Crescent Bed Co., Inc. v. Commissioner, 133 Fed. (2d) 424 (C.A. 5, 1943), affirming 46 B.T.A. 1280; Marble & Shattuck Chair Co., 39 Fed. (2d) 393, (C.A. 6, 1930) affirming 13 B.T.A. 657. We first consider the year 1949. Respondent allows a salary of $35,000 to each brother for that year, recognizing, in effect, an increase of $5,000 to each over their salaries for 1948. His determination is prima facie correct, and the burden *222 lies with the corporate petitioner to show error. The company fixed the amount of salary to each brother at $52,232.14, an increase to each of $22,232.14 over 1948. We think it clear that the corporate petitioner has failed to prove that the amounts so fixed are reasonable. At the same time, we think the record justifies salaries to each brother in excess of the amounts determined by respondent. In reaching this conclusion, and in determining, infra, the amounts which we hold to be allowable, we have given careful consideration to all of the evidence in the record, including that relating to the services performed by the brothers; their industry, capacities and versatility; the financial data presented; the method (formula) by which their salaries were calculated by the company; the information in the record as to compensation to officers by other organizations whose business activities bore some relationship to those of petitioner; the opinion evidence offered in connection therewith, and all other relevant factors set forth in our Findings and in the stipulation of the parties. It would serve no useful purpose to repeat or summarize all of these considerations in our Opinion. We *223 think it appropriate, however, to mention several factors. We think the record demonstrates that the progress of the company in 1949 is attributable in some measure to the services of the three brothers. The father, who had been the leader, died on April 1, 1949. The brothers took over his duties, allocating them substantially equally to each brother. The net income of the company increased from $232,105.81 (before officers' salaries) in 1948, when the brothers' compensation was $30,000 each, to $397,126.93 in 1949. This last factor is not to be overemphasized, because net sales did not increase in anything like the same proportion, and it is obvious that profits may fluctuate from year to year for reasons not attributable to officers' services (net profits before salaries increased in 1950, although net sales decreased slightly, while net profits before salaries decreased somewhat in 1951 although net sales materially increased). Nevertheless, we think that a substantial increase in earnings tends to support the view that the brothers, together, ably and successfully took over the entire management of the business. As mentioned above, we have given some consideration to the "formula" *224 upon which the salaries were based. We think it is an indication of an effort at consistent treatment of the problem. We do not, however, attribute to it the weight with which petitioner would have us regard it. We do not think a relationship of officers' salaries to labor cost is controlling, or essentially sound, particularly in the light of changing conditions from 1942 (and prior thereto) through 1949. We, of course, have noted that petitioner introduced testimony of the vice president of a somewhat similar organization who testified that the compensation determined by the company was reasonable, but his appraisal was based mainly on his rule of thumb opinion that any amount for total officers' salaries representing 5 to 6 per cent of sales was reasonable. In this connection, however, we also note that for each of the years 1949 and 1950, the combined officers' salaries came to more than 6 per cent of sales. We have considered the testimony of the witness and have utilized it to a limited degree in reaching our conclusion, but we do not consider ourselves bound by his ultimate opinion. An indication that an opinion based upon a ratio of officers' compensation to sales is not to *225 be accepted without reservation appears from facts already referred to showing that net sales for 1950 decreased below the 1949 figure, although, at the same time, net income before officers' salaries increased, while, in 1951, on the other hand, net sales increased materially, but net income before officers' salaries was less for that year than either 1949 or 1950. In all events, we conclude, upon consideration of all relevant factors, with some emphasis upon the taking over of the father's duties after April 1, 1949, and the continued success which attended the changeover, that part of the father's probable compensation, if he had lived, should be allocated equally to the brothers for 1949 and that the success of the company in 1949 should be reflected in the amount of compensation determined. It is our judgment, in the light of the foregoing, that, for the year 1949, an increase in the compensation of each brother of $12,500 over 1948 compensation is justified by the record, resulting in the allowance of total compensation to each in the amount of $42,500 for the full year 1949. Respondent allowed $40,000 as compensation to each brother for each of the years 1950 and 1951 (an increase *226 of $10,000 to each over 1948). His determination is prima facie correct. Our analysis of the problem of compensation for the brothers in 1949, and our further consideration of the record relating to 1950 and 1951, leave us with no doubt that the corporate petitioner has failed to meet the burden of proving that compensation, fixed by the company at $65,290.17 for each brother for each of the years 1950 and 1951 was reasonable. The increase adds 25 per cent to the compensation of each as fixed by the company for the year 1949. The record does not, in our judgment, furnish a basis for such increases. We think it unnecessary to repeat our own discussion of 1949 compensation as background for discussing 1950 and 1951. We think that in essential respects the business was neither more nor less successful and that the services of the brothers were not, to any substantial extent, more valuable or extensive in 1950 and 1951 than in 1949, except for the fact that in 1950 and 1951, the brothers, together, were in complete charge of the entire management of the business and were in full stride as such for the entire year, instead of taking over and managing the business for nine months, as in *227 1949. It is true that net income before officers' salaries increased in 1950, but net sales dropped off slightly. On the other hand, in 1951, net sales materially increased, but net profits before officers' salaries dropped below 1949. We have no doubt that Korean War conditions were in part responsible for the variations in 1950 and 1951, but the over-all picture from the standpoint of compensation does not, in our judgment, vary materially from 1949. We note the fact that the Renegotiation Board did not question officers' compensation, and we have given consideration thereto, but we do not know what record was before the Board, and absence of action on the part of the Board is clearly not binding upon us or upon respondent. Kerrigan Iron Works, Inc., 17 T.C. 566, 573 (1951). Consistent with the foregoing, we conclude that compensation of $47,500 is properly allowable to each brother for each of the years 1950 and 1951, representing an annual increase of $5,000 to each over compensation for 1949. Payment of $13,012.50 With respect to the payment of $13,012.50 to Alice Ryder, respondent challenges only the allegations of Alice Ryder that the amount represented a gift rather than *228 taxable income. The resolution of this question depends upon the intentions of the parties, particularly that of the employer, which intention must be gleaned from the circumstances surrounding the transaction. Estate of Frank J. Foote, 28 T.C. 547, 549 (1957). We think the payment represented a gift. Alice Ryder performed no services for the company at the time of the accrual of the payment in question. She owned only 47 1/2 shares of the 500 shares of stock outstanding, although control of the stock was in her family. The amount was paid directly to her and not to her husband's estate. There was no obligation on the part of the company to make such payment to her. These facts were present in Estate of Arthur W. Hellstrom, 24 T.C. 916 (1955), and were deemed sufficient there to support the view that the payment was a gift. We think the facts stated above outweigh any indications to the contrary, and support a holding that the payment was not taxable income. Estate of Frank Foote, supra; Florence E. Carr, 28 T.C. 779, 781 (1957), on appeal (C.A. 2); Florence S. Luntz, 29 T.C. - (Filed January 13, 1958). Respondent argues that the company deducted the accrued amount on its tax *229 return and that Alice included it in her 1950 return as taxable income. These circumstances, while factors to be taken into consideration, are not controlling and, of themselves, do not require a conclusion contrary to the one we have drawn. Estate of Arthur W. Hellstrom, supra; Estate of Frank J. Foote, supra.
Respondent argues that there was no authorization for the payment and, therefore, that there can have been no gift. We agree that the record does not show any formal authorization. There is no dispute, however, that Alice received the amount of $13,012.50 in 1950, and there is convincing oral testimony that it was intended as a gift to her. Respondent argues further that since the amount paid was computed on the basis of the amount which W. E. Ryder had earned during the first quarter of 1949, the amount represents compensation. We need not decide whether the equivalent of the amount paid to Alice was earned by and should be deemed to be income to W. E. Ryder or his estate, since his taxes and those of his estate are not before us. Assuming that it should have been so treated, or that the payment to Alice was measured by compensation which would have been paid to W. E. Ryder, *230 we note, as we noted in Estate of Arthur W. Hellstrom, supra, that gifts to widows are frequently determined by the amount which an officer or employee would have earned had he lived. Assuming, arguendo, that the amount was earned prior to the death of W. E. Ryder, that fact would not alter our conclusion that the amount was not taxable income to Alice Ryder. In Florence E. Carr, supra, where the corporation was bound by contract to pay over to the employer's widow, in installments, amounts earned by the employee before the contract was entered into, we held that the amounts did not constitute taxable income to the widow. And in Estate of John A. Maycann, 29 T.C. 81, where respondent argued that a bonus which had been paid to the widow in an amount equal to that which had been paid consistently to the deceased in prior years, should, because the practice was consistent, be deemed to have been earned by the deceased before his death, we held that the testimony of officers to the effect that the payment was intended as a gift must prevail over respondent's argument. In the light of the foregoing discussion, we hold that the payment of $13,012.50 received by Alice Ryder in 1950 was *231 not taxable income to her and should not have been reported as such in her return for that year. Pension Issue We have found as a fact that the payments to Alice by Standard pursuant to the agreement of February 17, 1949, and motion adopted by the board under date of July 5, 1949, both of which are set forth in our Findings of Fact, were distributions of profits. Accordingly, payments are taxable to, and includible in, Alice's income, and are not deductible by Standard. Petitioner argues that the amount is deductible by Standard and not includible in Alice Ryder's income, relying mainly on Rev. Rul. 54-625, C.B. 1954-2, 85, and upon the cases therein cited on the deduction issue. While the facts stated in that ruling bear some resemblance to those before us, there are facts here present which we think controlling, and which lead to a contrary view. The facts which emerge in this case as the distinguishing features are that under the agreement it was necessary that the stock of her husband pass to Alice outright or in trust, either by her husband's will or by operation of law, and also that she retain the stock in order for her to receive the "pension." We think the requirements that *232 Alice must receive and retain her husband's stock are here controlling. Moreover, neither the agreement nor the resolution of the board recite that the payments were in recognition of her husband's past services. The only recital of purpose relates to "restrictions upon the transfer of the shares." Thus, the complexion of the payments is one of distribution of earnings to stockholders in order to deter alienation of stock, rather than to compensate for past services, even though measured thereby. In this respect, the importance to the family of control of the company is a factor of significance. The intention of the parties, as stated in the agreement, was to provide "certain restrictions on the transfer of the Shares." The parties promised that if the described beneficiaries of the deceased officer would not transfer their shares, they would profit from the corporation's business beyond the regular dividends receivable from the ownership of the shares. Standard was not a party to the agreement, and its authorization of payment of the amounts called for in the agreement was procured by the controlling stockholders "pursuant to Article #3 of our Agreement executed by the stockholders *233 of the Company," under which Alice Ryder was "entitled to a pension from the Company." No such motive as compensation for her husband's past services is brought out in the record. Respondent argues that the case of Astorian-Budget Publishing Co., 44 B.T.A. 969 (1941) is controlling, and we agree. In that case an heir of a deceased stockholder, who inherited stock in the corporation, was paid certain amounts pursuant to an agreement among the stockholders to pay to his heir the salary of any stockholder who died so long as the stock was held by the heir. The agreement was among stockholders only and the corporation was not a party. We there held that no deduction for the payment was allowable to the corporation, which paid amounts to the heir of a deceased stockholder-signatory. As to the requirement that the heir hold the stock, we said (p. 973): "Such a provision bears more earmarks of a special provision for the distribution of profits to an officerstockholder than it does to a pension payment." Petitioners attempt to distinguish the Astorian-Budget case on the grounds that the case dealt with an agreement which provided for payment to be made to the deceased stockholder's estate *234 or next-of-kin, relying on Est. of Edward Bausch, et al, 14 T.C. 1433, affd. 186 Fed. (2d) 313 (C.A. 2, 1951). However, the Findings of Fact in Astorian-Budget recite that payment was to be made to the widow or next-of-kin, and payment was made directly to the next-of-kin of the deceased stockholder except during the period of administration of his estate. We see no significant difference between the provisions of the contract in Astorian-Budget and the one involved herein which would in any way support petitioners' contention. Furthermore, as pointed out in Estate of Edward Bausch, supra, the fact that payment was made to the estate is significant only as it tends to prove that the payment was not intended as a gift. Cf., e.g., Estate of Frank J. Foote, supra.In our case (as in some respects in Astorian-Budget, supra), other facts above adverted to - that the agreement required the intended recipient to receive and retain the stock; the absence of evidence that the payments were in compensation for past services; the fact that the corporation was not a party to the agreement and that the carrying out the provisions of the agreement was procured by the stockholders who wanted *235 the stock to remain in the family - negative any intention to make a gift, or pay a pension, and, to the contrary, tend to establish that the significant reason for the payments was to discourage the recipient from transferring her stock. Since we hold that the payments represented a distribution of profits by the company, they, of course, consituted income to Alice Ryder and are to be included as such in the year of receipt. Correspondingly, they are not deductible by Standard. Issue re Additions to Tax With respect to the additions to tax determined for failure to file a declaration of estimated tax for the year 1950, petitioner had failed to carry her burden of proving error in respondent's determination. On brief, it is argued that petitioner was aged and "placed these affairs in the hands of Edwin J. Yentzer, a certified public accountant and a capable person to handle tax affairs." There is no evidence in the record (and petitioner's brief furnishes no reference to the transcript) to the effect that petitioner was infirm in 1950, and did not pay attention to her affairs, or that she relied wholly or even substantially on Yentzer. Inconsistent with the inference which petitioner *236 would have us draw from age alone, petitioner was elected to the board of directors of Standard in January of 1950, and from the minutes it appears that she took an active part in the affairs of the corporation. It is also argued on behalf of Alice that there was disagreement with respect to the taxability of the payments, and that she would not have had to file a declaration of estimated tax if it were not for the inclusion of the payments in income. It is urged on this premise that her failure to file an estimated declaration was due to reasonable cause, and not to negligence. Petitioner, however, has not shown that her gross income from sources other than the payments in question could not reasonably be expected to be in excess of $600, and that her gross income from sources other than wages would not reasonably be expected to exceed $100 for the year in question. Section 58(a)(2) of the Internal Revenue Code of 1939. Her return for 1950 discloses income in excess of the minimum statutory requirements for filing a declaration of estimated tax. Moreover, there is no evidence that her failure to file a declaration of estimated tax was due to the fact that she thougth the amounts here *237 in question were not taxable. Indeed, for the year in question, a substantial portion of such payments were reported by her as income. We think it clear, therefore, that petitioner has failed to sustain her burden of proof on this issue. Since her failure to file a declaration of estimated tax is deemed to be equivalent to an estimate of zero, the addition to tax under section 294(d)(2) is applicable. The amounts of the additions must, of course, await the final computations under Rule 50. Decisions will be entered under Rule 50. Footnotes
*. Before salaries subtracted.↩
1. See infra as to substantial compensation of the two salesmen.↩
*. After salaries, but before taxes. ↩
**. No information available.↩